651 F.2d 355
 CHATHAM VENTURES, INC., et al., Plaintiffs,
Scott Thompson and Laurie K. Abbott, Plaintiffs-Appellants,
v.
FEDERAL DEPOSIT INSURANCE CORPORATION, Defendants-Appellees.
CHATHAM VENTURES, INC., et al., Plaintiffs,
Scott Thompson and Laurie K. Abbott, Plaintiffs-Appellants,
v.
FEDERAL DEPOSIT INSURANCE CORPORATION, Defendant-Appellee.
 No. 80-7599.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit B
 July 20, 1981.
Rehearing and Rehearing En Banc Denied Sept. 11, 1981.
 Joseph B. Bergen, Anthony H. Abbott, William F. Braziel, Jr., Savannah, Ga., for plaintiffs-appellants.
 Leamon R. Holliday, Savannah, Ga., Frank L. Skillern, Jr., Myers N. Fisher, Albert J. Tumpson, FDIC, Washington, D. C., for defendants-appellees.
 Appeal from the United States District Court for the Southern District of Georgia.
 Before TUTTLE, HILL and THOMAS A. CLARK, Circuit Judges.
 TUTTLE, Circuit Judge:
 
 
 1
 Once again this Court entertains a challenge to the ability of the Federal Deposit Insurance Corporation (FDIC) to collect the balance due on a long overdue note. Obligors (Scott Thompson and Laurie Abbott), on September 20, 1974 executed a real estate note payable to Hamilton Mortgage Corporation in the amount of $350,000. This note was one part of the documentation for a transaction styled as an acquisition and development loan. Principal and interest were by the terms of the written agreement declared to be due on March 20, 1975. This money has never been paid, and the present action concerns the respective rights of the obligors and the FDIC, as present holder of the note.
 
 
 2
 Despite their failure to pay the note, the obligors claim that Hamilton Mortgage was the first party to breach the agreement. They claim that the written agreement was only a part of a larger joint venture agreement in which Hamilton Mortgage agreed to fund a total of $1,400,000 for development expenses for the property. When the property was ready for development in March of 1975, Hamilton Mortgage, which was approaching insolvency, did not advance further funds and this failure, according to the obligors, breached the joint venture agreement. It is this theory of the case that supports the obligors' refusal to pay the amount owed in the note and also their subsequent claim for damages.
 
 
 3
 The FDIC is now the holder of the note which it acquired through a complicated set of circumstances. On October 25, 1975, Hamilton Mortgage conveyed to Hamilton National Bank, which was approaching insolvency, a 97.45% interest in the security deed and promissory note executed by the obligors. On February 16, 1976, the receiver of Hamilton National Bank sold this 97.45% interest to FDIC in its corporate capacity. Hamilton Mortgage, on February 19, 1976, filed a voluntary petition for bankruptcy. On December 5, 1977, as a part of a settlement agreement relating to a dispute between the trustee and the FDIC, the bankruptcy trustee for Hamilton Mortgage transferred to the FDIC the remaining interest in the deed and note.
 
 
 4
 The present legal proceedings commenced shortly thereafter. On May 30, 1978, the FDIC through its attorneys wrote the obligors demanding payment of the principal and interest. The obligors responded by filing this suit against the FDIC and others.[1] The amended complaint of the obligors challenged the FDIC's right to collect on the note and asked for a total "set-off" of $1,335,000 against the $350,000 note. The FDIC answered the complaint and counterclaimed on the $350,000 note seeking principal, interest, attorneys fees, and costs. On January 11, 1980, the district court granted the FDIC's motion for summary judgment on the counterclaim. The district court found that the joint venture agreement could not be asserted against the FDIC because of its statutory protection from unwritten side agreements to assets which it purchases, 12 U.S.C.A. § 1823(e) (West 1980)[2], and the FDIC prevailed. From this judgment the obligors appeal.
 
 1. Applicability of 12 U.S.C. § 1823(e)
 
 5
 This Court must first decide to what extent the FDIC may use its statutory shield, 12 U.S.C. § 1823(e). Plaintiff-obligors claim that the FDIC is not shielded from any unwritten side agreements because of the manner in which the FDIC acquired the note. This procedure, obligors contend, strips FDIC of any statutory protection because the original purchase of the 97.45% interest did not result in the FDIC's physical possession of the note and the subsequent purchase of the 2.55% interest was not the purchase of an asset of an insured bank under the terms of 12 U.S.C. § 1823.
 
 
 6
 The obligors' first argument is that the statutory protection does not apply to the 97.45% interest acquired by the FDIC from Hamilton National Bank. The argument turns on the obligors' belief that FDIC was not a "holder" of the note, having not acquired it through negotiation, and that under Georgia law, a partial assignment of a debt cannot be enforced in a court of law unless the debtor has consented to such an action. See Wilson v. Etheredge, 174 Ga. 386, 387, 162 S.E. 707 (1932); Brown v. West, 35 Ga.App. 444, 133 S.E. 304 (1926).
 
 
 7
 This argument is wholly misguided. The FDIC may purchase any asset of an insured bank.[3] See FDIC v. Abraham, 439 F.Supp. 1150, 1152 (E.D.La.1977); FDIC v. Rectenwall, 97 F.Supp. 273, 274 (N.D.Ind.1951). Clearly the 97.45% interest was an asset; it was not worthless.[4] We reject the obligors' arguments directed at the applicability of section 1823(e) with respect to the 97.45% interest.[5]
 
 
 8
 Analysis of the remaining 2.55% interest requires an extension of our previous discussion. The obligors contend that this acquisition was not from an insured bank and did not occur until over 21 months after the transfer of the assets and liabilities of the failed bank, Hamilton National, to another bank and the FDIC. The obligors, thus, question whether this transaction was made under the FDIC's power under 12 U.S.C. § 1823(e).
 
 
 9
 We reject the obligors' argument. The FDIC, in this case, had already purchased from the receiver of Hamilton National Bank an asset, a very large interest in a note, under its powers given by section 1823(e). The acquisition of the remaining 2.55% interest and the physical acquisition of the note was clearly part of a transaction entered to protect of the FDIC's earlier purchase of an asset of an insured bank when the purchase would facilitate the transition of that bank's business to a solvent bank.[6] The FDIC may "exercise ... all powers specifically granted ..., and such incidental powers as shall be necessary to carry out the powers so granted." 12 U.S.C.A. § 1819 (Seventh) (West 1980). The FDIC, then, acquired the note and the 2.55% interest in a proper use of its powers to aid the banking industry in event of a bank's insolvency.[7] The statutory protection of section 1823(e) shields the FDIC from defenses or claims raised with respect to "any asset acquired by it under this section." 12 U.S.C. § 1823(e). The use of incidental powers, which are necessary to carry out the specific powers of section 1823(e), is sufficient to make the acquisition in question one that was made "under this section."[8]
 
 
 10
 Obligors also insist the statutory protection of section 1823(e) extends to the FDIC only if (1) the obligor in the note was a customer of the insured bank and (2) the obligor lends himself to a deceptive scheme that overstates the assets of the bank. They argue that neither test is met in this case because the obligor dealt only with the mortgage company, not the bank, and they had only innocent motives, lacking an intent to deceive.
 
 
 11
 The obligors' first argument must fail. Their authority offered in support of this proposition does not compel the proffered conclusion.[9] On the other hand, this Court has previously reached this question and decided it contrary to the interpretation offered by the obligors. In FDIC v. Hoover-Morris Enterprises, 642 F.2d 785 at 788 (5th Cir. 1981), this Court held that "(t)he fact that (the obligors) dealt with Hamilton Mortgage, rather than the insolvent bank is of no consequence" in deciding whether the FDIC may invoke the protection of section 1823(e).[10] This conclusion seems consistent with the language of the statute which makes no express exception for agreements initiated by a third party and the obligors.[11] Other courts have also reached the same conclusion that the obligor need not deal directly with the insured bank before the FDIC may invoke section 1823(e).[12] The obligors cannot succeed in this argument.
 
 
 12
 The obligors' second argument must also fail. The statute, by its terms does not require that the obligor lend himself to a deceptive scheme in the sense of participating with culpability in a fraud. The statute and the cases only require that the obligor lend himself "to a scheme or arrangement whereby the banking authority on which the FDIC relied ... was or was likely to be misled." D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447, 460, 62 S.Ct. 676, 681, 86 L.Ed. 956 (1942). Of course if the obligors may assert oral side agreements reducing the value of the assets formerly held by the bank, then the FDIC would be misled.[13] This Court holds, in the manner most consistent with the statute, that the FDIC may invoke the defense of section 1823(e) where the obligors seek to assert such an oral side agreement[14] that by its nature would tend to mislead the FDIC.
 
 
 13
 The FDIC in this case correctly invoked its protection under section 1823(e). The obligors grudgingly admit that the joint venture agreement was oral. It thus fails to meet the statute's first requirement of a valid agreement assertible against the FDIC: that the agreement to be valid "shall be in writing." The obligors may not assert such an agreement against the FDIC and, thus, they present no issue of material fact in dispute. Under these circumstances, the district court's grant of summary judgment was proper and is affirmed.
 
 2. Due Process
 
 14
 Obligors also contend that application of section 1823(e) to their case denies them due process of law under the fifth amendment to the United States Constitution. They argue that they had no opportunity to create a valid agreement under section 1823(e), because they did not know that the partial interest in the note had been transferred to an insured bank until the FDIC had already acquired that interest. This procedure is unfair, they argue, because the transfers, which effectively deprived the obligors of "a right to setoff," occurred without notice and an opportunity for a hearing.
 
 
 15
 We reject the obligors' due process argument that is based upon a lack of hearing or notice. The obligors cite case law concerning the process that is due when a person's rights are decided by a governmental body. Yet the obligors point to no specific instance where they were deprived of due process. A United States district court did judicially approve the sale of assets from the receiver of Hamilton National Bank to the corporate FDIC. In the Matter of the Liquidation of the Hamilton National Bank, Chattanooga, Tennessee, Civil No. 1-76-32 (E.D.Tenn. Feb. 16, 1976). Only upon that acquisition of an interest in the note by the FDIC did section 1823(e) become applicable. Only at that point did any arm of the federal government even arguably first deprive the obligors of any rights. But due process does not require that the obligors be parties to a hearing at the time of the transfer. Subsequent judicial proceedings can safeguard any substantive rights the obligors possess.
 
 
 16
 "The special character of banks, and the delicate problems involved in processing credit, justify denial of a judicial hearing which would be essential in other situations." A right to a hearing subsequent to the receivership and purchase and assumption transactions is adequate to protect (the obligor's) right to due process.
 
 
 17
 FDIC v. Lesselyoung, 476 F.Supp. 938, 945 (E.D.Wis.1979), aff'd sub. nom. FDIC v. Lauterbach, 626 F.2d 1327 (7th Cir. 1980). Due process is satisfied by the subsequent proceedings held before the district court and this Court, where the obligors were free to make their case in any manner they chose. And only in those proceedings have their rights been finally adjudged.
 
 
 18
 The obligors' argument also appears to have another component. At the transfer of the asset from Hamilton Mortgage Company to Hamilton National Bank they lost the ability to comply with the terms of the statute and they had no notice of the transfer until it was consummated. Although their argument is couched in terms of procedural due process, the obligors appear most disturbed by the substantive provisions of section 1823(e) that allow the retroactive alteration of parties' substantive rights[15] upon a transfer of an asset to the FDIC when an earlier and unnoticed transfer of the asset to an insured bank made possible the later transfer. We reject the obligors' argument, to the extent it questions the substantive provisions of section 1823(e) in this manner. When one makes a note, events beyond the obligor's control may alter his obligations or rights without notice to him. An analogy, although not perfect, is the holder in due course doctrine where a transferee may acquire greater rights against the obligor than the rights of the original holder.[16] Clearly Congress may constitutionally enact reasonable legislation that shields the FDIC in this manner. We decline the obligors' invitation to declare the operation of this statute unconstitutional, either in whole or in part.
 
 
 19
 The judgment of the district court is AFFIRMED.
 
 
 20
 THOMAS A. CLARK, Circuit Judge, specially concurring:
 
 
 21
 While I concur in the result reached by the majority opinion I cannot subscribe to the scope of the opinion. I interpret 12 U.S.C. § 1823(e) to immunize the FDIC, after it acquires assets from a bank which it insured and which is in receivership or liquidation, from any liability pursuant to an agreement between the insured bank and its customer if the agreement permits diminution in the value of an acquired asset, unless the agreement meets the requirements of the statute, that is, it must be executed in writing by the bank and the person claiming against the bank contemporaneously with the acquisition of the asset by the bank, be approved by the bank's board of directors, and from the time of its execution be an official record of the bank.
 
 
 22
 This statute has a significant public policy purpose in protecting the FDIC and depositors of national banks. It protects the integrity of our national banking system by inhibiting a national bank from entering into an unrecorded collateral agreement with its customer, which could diminish an asset of the bank. By virtue of the statute a customer of a bank is on notice that if his loan transaction carries with it an obligation of the bank to be fulfilled during the term of the loan, the agreement must meet the criteria of the statute to be enforceable if the bank goes into receivership under the aegis of the FDIC.
 
 
 23
 I interpret the majority opinion to extend the statute to every such agreement as just described if a person's note becomes an asset of a bank, regardless of who the initial obligee is. The following simple example will illustrate my concern. Assume a mortgage company lends one million dollars to a developer in consideration of a note secured by a mortgage on the developer's property, and contemporaneously writes a letter to the developer agreeing to lend to the developer 75% of the cost of improvements on the land upon certain described terms. Next assume that the mortgage company, to meet its own financial needs, assigns to a national bank the note and mortgage as collateral. Then assume that the mortgage company has financial difficulties, cannot pay the bank, and the bank acquires title to the note and mortgage. Assume further that the bank then goes into liquidation and the FDIC acquires the note and mortgage. The developer calls on the mortgage company, bank, and FDIC to fulfill the obligation to fund the development, and the mortgage company and bank are unable to and the FDIC refuses. Upon subsequent litigation between the FDIC and the developer, the reach of the majority opinions forbids the developer from relying on his initial agreement with the mortgage company, which was part of the consideration of the loan.
 
 
 24
 Despite the public policy purposes of the statute, I do not believe that the statute reaches as far as the majority opinion takes it. Such a reach permits an impairment of contracts and in my opinion was never intended by Congress.
 
 
 25
 Respectfully, I recognize the majority opinion's reliance upon FDIC v. Hoover-Morris Enterprises, 642 F.2d 785 (5th Cir. 1981). While I do not think that opinion controls this case I concur in this case rather than dissent. The alleged side agreement there involved an agreement on the part of the mortgage company to accept a deed from the mortgagors as payment for the secured debt in lieu of foreclosure. That agreement was not made contemporaneously with and as part of the consideration of the initial loan, but was made only after the debtor defaulted. Our case differs and applies the statute to an agreement made contemporaneously with the loan and made a part of the entire loan transaction. Cf. Riverside Park Realty Co. v. FDIC, 465 F.Supp. 305 (M.D.Tenn.1978). For the foregoing reasons I do not believe Congress intended the statute to reach an agreement made between an obligor and an obligee which contains covenants on the part of the obligee as well as the obligor, arising in transactions that do not involve a national bank at the time of the making of the loan agreement. The obligor should not be required to anticipate the FDIC as a future assignee with the defenses contained in the statute.
 
 
 
 [1]
 One action was filed in state court and was removed upon petition of the FDIC. The other originated in the federal district court. The two cases were consolidated in the pretrial stage. Claims against defendants other than the FDIC have been dismissed without prejudice by order of the district court
 
 
 [2]
 The FDIC's statutory protection provides that:
 No agreement which tends to diminish or defeat the right, title or interest of the Corporation in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank.
 12 U.S.C.A. § 1823(e) (West 1980).
 
 
 [3]
 Of course certain conditions must be met. The statute provides that:
 ... Whenever in the judgment of the Board of Directors such action ... will facilitate the sale of the assets of an open or closed insured bank to and assumption of its liabilities by another insured bank.... the Corporation may purchase any ... assets (of an open or closed insured bank)....
 12 U.S.C. § 1823(e) (West 1980) (emphasis added). The obligors do not contest that the purchase of the 97.45% interest by the FDIC was purchased from an insured bank or that the purchase by the FDIC facilitated the sale of assets to and assumption of liabilities by another insured bank.
 
 
 [4]
 Georgia law would have allowed the FDIC as owner of a partial assignment of a note, rather than a holder of the note, to bring a suit in equity
 It is ... well settled in this State that such an assignment is enforceable in equity, although the debtor may not assent, if all parties at interest are before the court, so that the right of each in the fund may be determined in one suit and settled by one decree.
 Graham v. Southern Ry., 173 Ga. 573, 576, 161 S.E. 125 (1931). Any requirement that Hamilton Mortgage as assignor of a partial interest and holder of the note be joined in that suit does not alter the conclusion that the 97.45% interest already purchased by the FDIC was an "asset" within the meaning of the federal statute. The procedure required by state law might have made enforcement of the FDIC's rights more difficult but it did not make them worthless, and thus we need not decide what result would obtain if state law made the FDIC's rights worthless.
 
 
 [5]
 This conclusion does not, contrary to the obligors' contention, "afford (Hamilton Mortgage,) a private corporation(,) the protection of 1823(e)." If an action had been brought on the note when Hamilton Mortgage owned a fractional interest in the note, the FDIC would have had its statutory protection, but that statutory protection would not necessarily extend to Hamilton Mortgage as well
 
 
 [6]
 Hamilton Mortgage, the holder of both the note and the remaining interest in the note, filed a bankruptcy petition shortly after the FDIC's purchase from the receiver. Conflict developed between the trustee in bankruptcy for Hamilton Mortgage and the FDIC. The trustee questioned the interest asserted by the FDIC in many of the loans it had purchased from Hamilton National Bank. In addition, joint administration of the loans that were jointly owned by the trustee and FDIC was "very difficult" because those two co-owners were working at "cross-purposes" with the FDIC seeking "to liquidate (the) assets as rapidly as possible" while the trustee pursued a goal that would take a longer period of time, the rehabilitation of Hamilton Mortgage for the benefit of the general unsecured creditors. Pursuant to a settlement agreement approved by the bankruptcy court, the trustee "sold and endorsed to" the FDIC its remaining interest in the obligors' note and assigned to the FDIC the deed to secure debt. In return, the FDIC gave up its interest in other assets, formerly owned by Hamilton National
 
 
 [7]
 Cf. FDIC v. Sumner Financial Corp., 451 F.2d 898, 900-03 (5th Cir. 1971) (quoting 12 U.S.C. § 1819 (Seventh) and concluding that "since Congress has entrusted the FDIC with the regulation of ... bank interest rates and the advertisement of those rates, the FDIC has the power to make such rules as are reasonable and necessary to effectuate the purpose of the act")
 
 
 [8]
 Two district court opinions suggest the same result but do not indicate the reasoning behind their conclusions. See FDIC v. Kucera Builders, 503 F.Supp. 967, 970 (N.D.Ga.1980); FDIC v. Hoover-Morris Enterprises, No. 78-1782A (N.D.Ga. March 25, 1980), aff'd, 642 F.2d 785 (5th Cir. 1981). Those cases arose out of similar transactions initiated by Hamilton Mortgage which made a partial assignment in a note to Hamilton National Bank. The FDIC subsequently played the same role in those transactions that it had in this case. Apparently the obligors in those cases questioned whether the FDIC's receipt of the note and partial interest in the note from the mortgage company, triggered the statutory protection of § 1823(a). In Hoover-Morris, the district court stated that:
 Pursuant to two transfers set out in the introduction, plaintiff Federal Deposit Insurance Corporation became the sole owner of the Note sued upon, and the deed of trust to secure payment of the Note. It owned the entire Note, not as a receiver, but in its corporate capacity. (Despite defendants' argument to the contrary, the material facts uncontroverted by defendants fully support this conclusion. See Local Court Rule 91.72). Under these circumstances, 12 U.S.C. § 1823(e) applies....
 Id., slip op. at 4. The Fifth Circuit affirmance of this opinion does not refer to this issue. In Kucera Builders the district court stated that:
 Defendants argue, however, that despite the shielding effect of section 1823(e) in the above cases the affidavit filed by Richard Gaskill on behalf of the plaintiffs is insufficient to insure that section 1823(e)'s protective cover for the FDIC as liquidator of a failed bank is applicable here. Defendants contend that the affidavit of the liquidator does not show the existence of certain receiverships, certain situations which will facilitate a merger or consideration or an insured bank with another insured bank, or certain situations which will facilitate the sale of the assets of an open or closed insured bank to and assumption of its liabilities by another insured bank. Since these facts are absent, defendants argue, the shield of section 1823(e) cannot be used as the "no agreement which tends to diminish ..." language relied on by plaintiff is by its own terms only applicable to assets acquired by the FDIC under section 1823.
 The Court points defendants to paragraph 6 and exhibit A-4 in Gaskill's affidavit. That paragraph and the documents to which it refers clearly show that this case is one where the receiver or liquidator of an insured bank, closed on account of inability to meet the demands of its depositors, is entitled to offer the assets of the bank for sale to the FDIC as allowed by section 1823(d), and that such a transaction has herein occurred. The Court therefore finds no merit to defendants' first contention that section 1823(e) is inapplicable.
 
 
 [503]
 F.Supp. at 970. It is not clear that the defendants in Kucera Builders made the same arguments that the appellants in this case have made. This Court, however, has now specifically rejected those arguments
 
 
 [9]
 The Court in D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), a case that antedates the statute to be construed, used language which may indicate that the Court was impressed by the fact that the maker had dealt directly with the bank. In addition, the obligors' cite to the Congressional debates where one representative discussed the effect of the statute on "agreements ... entered into between customers of the bank and the bank." 86 Cong.Rec. 10731 (1950). But neither citation disposes of the present case. The D'Oench Court did not face facts like those of the present case and did not need to reach the question. The legislative history is not dispositive because there is no indication in the language quoted by the obligors that the representative intended thereby to exclude agreements initially reached between obligors and a third party. Absent the presence of a fact pattern similar to the present case, one would naturally discuss the FDIC's defense in terms of agreements made between the bank and its customers because the bank would most often directly acquire the asset from the obligor
 
 
 [10]
 We understand the concerns of Judge Clark who concurs specially. But we believe those issues he raises are settled by the rule of stare decisis
 Whatever might have been our view to the merits of the debate over whether the FDIC's statutory protection applies to notes on which a bank was not the initial obligee, this panel must follow the specific holding on this point by FDIC v. Hoover-Morris Enterprises, 642 F.2d 785 (5th Cir. 1981). The law of this Circuit is now clear. The statute applies to notes where a mortgage company was the original obligee and the insured bank acquires the obligation.
 Judge Clark's difficulty with our holding also relates to a separate question. He questions whether the statute would protect the FDIC from defenses and claims arising out of the same agreement upon which the FDIC declares against the obligors. The district court in Riverside Park Realty Co. v. FDIC, 465 F.Supp. 305 (M.D.Tenn.1978), held that the statute did not protect the FDIC from such claims and defenses. This Court has previously reserved judgment on this question. See Black v. FDIC, 640 F.2d 699, 701 n.1 (5th Cir. 1981). The present appellant-obligors do not raise this issue on appeal to this Court. In fact, the obligors' brief describes the joint venture agreement as if it antedated the present note by almost two years. The note is apparently a self-contained agreement made without explicit reference to the alleged joint venture agreement. The obligors do not challenge the description offered by the district court.
 Plaintiffs contend that HMC made this loan in the capacity of a joint venturer with plaintiffs. The note, the deed, and the loan agreement made no reference to these parties being in such a relationship. The only reference to anything extraneous to the note and loan agreement which incorporated a September 5, 1974 commitment letter from HMC to Thompson and Abbott. The commitment letter was of a general nature expressing conditions regarding insurance, zoning, acceptance of the loan, etc. Nothing mentioning nor giving rise to an inference of a joint venture was contained in the September 5th commitment letter. The loan matured on March 20, 1975.
 The present case, thus differs from the Riverside Park case where the district court described the asserted agreement as being a part of the note held by the FDIC.
 Defendants' attempt to characterize the agreement that plaintiffs claim has been breached as a separate and unrecorded agreement is totally unpersuasive. The deed of trust under which the FDIC now seeks to foreclose incorporates by reference "as if fully set forth" the terms of the loan agreement that plaintiffs allege were breached. Furthermore, the deed of trust note, which in essence is what the FDIC seeks to enforce through foreclosure, contains these very terms. Therefore, since plaintiffs are not asserting a separate agreement to defeat the rights of the FDIC, defendants' agreement that § 1823(e) applies must fail.
 
 
 [465]
 F.Supp. at 313 (footnotes omitted). The present obligors allege a breach of a joint venture agreement which is clearly separate from the note and deed held by the FDIC. The holding in Black v. FDIC, 640 F.2d 699 (5th Cir. 1981), forecloses the argument that such a joint venture agreement is the same agreement as the note. In that case, the written agreement to fund development loans was held on its face not breached by a failure to fund subsequent construction loans which were alleged to be understood to be a part of the entire real estate package. Any assertion against the corporate FDIC of an unwritten agreement to fund such construction loans was then held barred by 12 U.S.C. § 1823(e). 640 F.2d at 700-02. In light of the Black court's reservation on whether the FDIC may use the statutory protection to shield itself from claims arising from the same agreement which the FDIC asserts against the obligors, the final holding of Black is clear. Any overarching unwritten agreement to complete a real estate deal is a separate agreement from a written note which in no manner refers to the larger asserted agreement. The Black case binds this Court on this issue even if the obligors had argued that a breach of the joint venture agreement was a breach of the note agreement upon which the FDIC seeks to recover
 
 
 [11]
 The language of the statute indicates that any agreement is invalid unless it has been "executed by the bank" and the adverse claimants at the acquisition of the asset. 12 U.S.C. § 1823(e). But this language in no manner limits the types of cases to which the section applies, rather it limits the defenses that can be raised against the FDIC
 
 
 [12]
 Howell v. Continental Credit Corp., No. 76-C-4542 (N.D.Ill. October 16, 1979), oral argument heard on appeal, No. 80-1566 (7th Cir. Jan. 16, 1981); FDIC v. C & A Carbone, Inc., No. 77-Civ.-1191 (S.D.N.Y. April 14, 1978)
 
 
 [13]
 The obligors' only case is from the Ninth Circuit, FDIC v. Meo, 505 F.2d 790 (9th Cir. 1974). That case is distinguishable from the present case. First, the Meo Court did not interpret § 1823(e) because FDIC was acting only as a receiver of the insured bank. Second, Meo as interpreted by the Ninth Circuit does not allow obligors to assert an unwritten side agreement against the FDIC (even in its receiver capacity) when the loan proceeds are actually given over to the obligors. See FDIC v. First National Finance Co., 587 F.2d 1009, 1012 (9th Cir. 1978). Meo is, thus, inapposite where there is an unwritten side agreement and the obligors are aware that the agreement would not be discovered by the FDIC. Such conditions fit the present case
 
 
 [14]
 Two district courts in unpublished opinions have summarily rejected identical arguments by other obligors who asked those courts to create judge-made exceptions to the statute. See Howell v. Continental Credit Corp., No. 76-C-4542 (N.D.Ill. Oct. 16, 1979); FDIC v. C & A Carbone, Inc., No. 77-Civ-1191 (S.D.N.Y. April 14, 1978)
 
 
 [15]
 What the obligors must be claiming to have lost is the ability to "setoff" the breach of oral agreements against the holder of the note because § 1823(e) in no manner limits the obligors' recourse against the initial obligee in this case, Hamilton Mortgage. We assume but do not decide, that this is a sufficient property interest to invoke due process concerns
 
 
 [16]
 The failure of an insured bank is an unexpected occurrence. The transfer of an asset to an insured bank that later fails is even more unexpected when the obligor originally signed the note with a mortgage company. Each occurrence, although unexpected, is possible in a modern commercial context. The obligors who wish to protect themselves in such a context should take precautions to ensure that neither a note nor an interest in a note will be transferred. The obligors might insert terms in the note making the rights under it non-transferrable. Of course, the present obligors created a negotiable instrument which was more valuable to the original obligee and hence apparently more advantageous to the obligors. Future obligors might opt to follow the same course as the present obligors, but their decision is a calculated business risk which is comparable to the chance anyone takes when he creates negotiable paper
 Or in the alternative, such obligors might take steps to satisfy the terms of § 1823(e), a law which all parties are presumed to know. A giant step towards that end would have been to reduce the alleged oral agreement to writing. Having failed to claim any attempt at such protective measures, the present obligors fail to make a convincing argument that they have been denied due process by a statute that was on the books when their note was signed.