IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE

FILED

September 17, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| ED REEVES, d/b/a ED'S IMPORTS, | ) | |
| | ) | |
| | ) | |
| Plaintiff/Appellee, | ) | |
| | ) | |
| v. | ) | No. 01A01-9807-CH-00379 |
| | ) | |
| GRANITE STATE INSURANCE CO., | ) | Grundy Chancery |
| | ) | No. 4708 |
| | ) | |
| Defendant/Appellant. | ) | |

APPEAL FROM THE CHANCERY COURT OF GRUNDY COUNTY
TENNESSEE

THE HONORABLE JEFFREY F. STEWART PRESIDING

ERNEST D. BENNETT, III
TAYLOR, PHILBIN, PIGUE, MARCHETTI
& BENNETT, PLLC
2908 Poston Avenue
Nashville, Tennessee 37203

Attorney for the Defendant/Appellant

ROBERT S. PETERS
100 First Avenue S.W.
Winchester, Tennessee 37398

Attorney for Plaintiff/Appellee

**AFFIRMED AND REMANDED**

PATRICIA COTTRELL, J.

CONCURS:
BEN CANTRELL, P. J., M.S.

DISSENTS IN SEPARATE OPINION:
WILLIAM C. KOCH, JR., J.

# OPINION

This is an action to recover upon an insurance policy insuring an automobile against loss. The named insured, Mr. Nance, the owner of the automobile, is not a party to the action. Instead, the suit was brought by Ed Reeves, doing business as Ed's Imports, in his capacity as the loss payee named in the insurance policy. This appeal involves the rights of the loss payee under the loss payable provision of the insurance contract where, after the loss, the insurance company canceled the policy retroactively due to a discovered misrepresentation in the application by the insured. The trial court ruled in favor of the appellee, Ed's Imports. We affirm.

Ed Reeves, doing business as Ed's Imports, sold a 1992 Nissan Maxima to Mr. Nance and financed this purchase. Mr. Nance gave Mr. Reeves a promissory note, and agreed to maintain insurance coverage on the car. Mr. Nance purchased that insurance from Granite State Insurance Company, the appellant. Granite State issued the policy, which designated Ed's Imports as the loss payee. Also included in the policy was a provision establishing a "deductible" for the loss payee. Ed's Imports received notice of the insurance and its loss payee status from the insurer.

Mr. Nance's car was stolen on June 8, 1996, and a claim was filed. In the course of its investigation, Granite State discovered that Mr. Nance had been convicted of felonious possession of marijuana before he applied for insurance coverage. In his application for insurance, he had answered "no" to the question, "has anyone in household been arrested for any offense other than traffic offenses?" Based upon this misrepresentation by the insured, Granite State denied the claim and canceled the insurance policy retroactively, declaring it void *ab initio.*

Ed's Imports, the loss payee, does not dispute the insurance company's right to cancel the policy retroactively with regard to the insured. Therefore, we need not consider the validity of the insurance company's retroactive cancellation of the policy as to the insured.

Ed's Imports, the loss payee, attempted to recover from the insurance company, and Granite State denied that claim. Ed's Imports filed suit in the Chancery Court of Grundy County, and the matter was tried by Stipulation of Facts submitted by the parties. The trial court found that, under the terms of the policy, the loss payee was entitled to recover. The court found that the policy should be construed to require notice to the loss payee before cancellation would be effective as to the loss payee, that any ambiguity in this regard should be resolved in favor of the loss payee, and that the loss occurred prior to the notice of cancellation of the policy. The trial court awarded Ed's Imports the stipulated amount, $12,008. Granite State appeals that decision.

Counsel for both parties have clearly and accurately defined the issue for this Court and for the trial court:

> Whether Granite State's *ab initio* cancellation of the policy, subsequent to the loss, prevents recovery by the loss payee, based upon the terms and conditions of the policy and applicable law.

Since the questions raised herein are purely questions of law and not of fact, our review is *de novo* on the record with no presumption of correctness of the trial court's conclusions of law. *See Chrysler Credit Corp. v. Noles*, 813 S.W.2d 437, 438 (Tenn. App. 1990); *Adams v. Dean Roofing Co.*, 715 S.W.2d 341, 343 (Tenn. App. 1986).

## I.

Both parties rely upon the following provision, which they refer to as the

3

loss payable clause, and the outcome of this case largely turns on the interpretation of this language:

> Loss or damage under this policy shall be paid, as interest may appear, to you and the loss payee shown in the Declarations or in this endorsement. This insurance with respect to the interest of the loss payee, shall not become invalid because of your fraudulent acts or omissions unless the loss results from your conversion, secretion or embezzlement of "your covered auto." However, we reserve the right to cancel the policy as permitted by policy terms and cancellation shall terminate this agreement as to the loss payee's interest. We will give the same advance notice of cancellation to the loss payee as we give to the named insured shown in the Declarations.

Under Tennessee law, where an insurance contract includes an "open" or "simple" loss payable clause, a loss payee has no greater right than the insured. *See Hocking v. Virginia Fire & Marine Ins. Co.*, 99 Tenn. 729, 42 S.W. 451 (1897); *Central Nat'l Ins. Co. v. Manufacturers Acceptance Corp.*, 544 S.W.2d 362 (Tenn. 1967). Open or simple clauses designate the loss payee, and declare that the loss, if any, is payable to the mortgagee as its interest may appear. The rights of the mortgagee under a simple loss payee clause are wholly derivative and cannot exceed those of the insured. In *Hocking*, the court held that the act of the insured in burning down the covered property extinguished her right to recover under the insurance contract as well as the rights of the mortgagee or loss payee. *Hocking*, 42 S.W. at 451. In *Central National Insurance*, the chattel mortgagee/loss payee was denied recovery because of the acts of the insured who breached material conditions of the policy. *Central Nat'l Ins.*, 544 S.W.2d at 364. In that case, however, the court noted that the contract in question contained no language "protecting the interest of the mortgagee from acts or omissions of the insured-mortgagor." *Id.*

A clear majority of jurisdictions recognize the existence of a second type

of mortgagee or loss payee clause, the "standard" or "union" clause, which is the type referred to in *Central National Insurance* as missing from that contract. Standard or union clauses designate the mortgagee, and then go a step further. The signature characteristic of a standard clause is that it contains language insuring that the interest of the mortgagee will not be invalidated by certain acts of the insured. *See, e.g., Nationwide Mut. Ins. v. Dempsey*, 495 S.E.2d 914 (N.C. App. 1998); *see generally 4* Lee R. Russ, *Couch on Insurance 3d* § 65.32 *et seq.* A standard or union clause appears in a policy obtained by the mortgagor for the benefit of both the mortgagor and the mortgagee. Where an insurance policy contains a standard or union mortgage clause, the mortgagee has an independent contract with the insurer, the rights of a mortgagee can be greater than those of the insured, and the mortgagee's rights are determined by its separate contract with the insurer. *Id.* at § 65.32.

Tennessee courts have long recognized the existence of the two types of mortgagee or loss payee clauses and the difference in the effect of their inclusion in an insurance contract. *See Laurenzi v. Atlas Ins. Co.,* 131 Tenn. 644, 176 S.W. 1022 (1915).

> That view is that the contract evidenced by the rider is a separate and distinct one with the mortgagee, designed for his protection, and in operation from the date of its execution; that, in so far as the policy or contract with the mortgagor is in harmony therewith, it is to be referred to, to supplement and complete the terms of the mortgagee's contract, and, in so far as the policy is out of harmony with the rider, such adverse provisions are to be disregarded; and, further, that under such a contract the security of the mortgagee cannot be invalidated, either in whole or in part, by any act or neglect of the mortgagor, either prior or subsequent to the execution of such contract with the mortgagee.

*Laurenzi*, 176 S.W. at 1024.

5

Our courts have consistently held that where the insurance policy contains a standard or union mortgage clause, the mortgagee has an independent contract with the insurer. *See Third Nat'l Co. v. Thompson,* 28 Tenn. App. 436, 191 S.W.2d 190 (1945); *Phoenix Mut. Life Ins. Co. v. Aetna Ins. Co,* 59 S.W.2d 517 (Tenn. 1933); *Phoenix Mut. Life Ins. Co. v. Greene County Farmers' Mut. Fire Ins. Co.,* 54 S.W.2d 971 (Tenn. 1932). Although these cases deal with policies insuring real property,[1] Tennessee courts have also recognized that a standard mortgage clause contained in an insurance policy for personal property has the same effect. *See Union Planters Nat'l Bank v. American Home Assurance Co.,* 865 S.W.2d 907 (Tenn. App. 1993) (bank which lent money for purchase of an aircraft sued insurer under standard mortgage clause); *Noles,* 813 S.W.2d at 439 ("The primary importance of the distinction is that the standard clause provides a separate and distinct contract between the insurer and the lienholder," regarding an automobile liability policy); *Central Nat'l Ins. Co.,* 544 S.W.2d at 364 (while interpreting a simple or open clause contained in a motorcycle insurance policy, the court in dicta noted the existence of standard or union clauses).

In a recent case involving the applicability of the doctrine of *res judicata* to subrogation claims against the insured by an insurer who had paid the loss payee, this Court noted:

> We begin our analysis with the observation that plaintiff [the insurer] was charged with the knowledge that its separate contractual obligation with First

---

[1] A statute passed after *Laurenzi,* now codified at Tenn. Code Ann. § 56-7-804, protects the interest of a mortgagee from invalidation of a fire insurance policy on realty because of any act or neglect of the insured. The standard mortgage clauses in that type of policy could not provide less protection to the mortgagee than the statute. Thus, the language in the cases involving fire insurance on real property may indicate that the insurer cannot limit the loss payee's interest by specifying which acts of the insured may result in invalidation. The standard mortgage clause language required by Tenn. Code Ann. § 56-7-804 is not required in other types of insurance.

Tennessee [the loss payee] would not generally be invalidated by the acts of the insured or others . . .

*Penn-America Ins. Co. v. Crittenden*, 984 S.W.2d 231, 232 (Tenn. App. 1998).

Our Supreme Court has stated that the essential nature and purpose of a standard or union clause is "to furnish to the mortgagee a reliable security in a definite sum free from any interference on the part of the mortgagor which would, to any extent, invalidate or make less adequate that security." *Laurenzi*, 176 S.W. at 1026.

The loss payable clause at issue herein clearly includes the language necessary to classify it as a standard or union clause: "This insurance with respect to the interest of the loss payee, shall not become invalid because of your [the insured's] fraudulent acts or omissions unless the loss results from your conversion, secretion or embezzlement of 'your covered auto.' "[2] Thus,

---

[2] *Nationwide Mutual Insurance Co. v. Dempsey* involved a clause almost identical to the one in this case. That provision read:

> Loss or damage under this policy shall be paid as interest may appear to you and the loss payee shown in the Declarations. This insurance covering the interest of the loss payee shall become invalid only because of your conversion or secretion of your covered auto. However, we reserve the right to cancel the policy as permitted by policy terms and the cancellation shall terminate this agreement as to the loss payee's interest. We will give the loss payee 10 days notice of cancellation.

*Dempsey,* 495 S.E.2d at 915.

The court discussed the two types of mortgagee (or loss payee) clauses. "The first, typically referred to as a 'standard or union mortgage clause,' stipulates that 'the interest of the mortgagee in the proceeds of the policy shall not be invalidated by any act or neglect of the mortgagor.' This type of clause acts as a distinct and independent contract between the insurance company and the mortgagee and 'confer[s] greater coverage to the lienholder than the insured has in the underlying policy.'" *Id.* The court found that the language, "insurance covering the interest of the loss payee shall become invalid only because of your conversion or secretion of your covered auto," clearly extends to the loss payee greater coverage than that extended to the insured as it sets only two instances in which the loss payee's insurance coverage will become invalid. *Id.* at 916.

In *Pittsburgh National Bank v. Motorists Mutual Insurance Co.*, 87 Ohio App.3d 82, 84, 621 N.E.2d 875, 876 (1993), the Ohio Court of Appeals held that the following language, which echoes the language of the policy at issue, constituted a standard loss payable clause:

Granite State has provided greater protection to Ed's Imports than to the insured and has created a separate contract with Ed's Imports. In its brief, Granite State acknowledges that the loss payable clause in its policy is a standard mortgage clause, but asserts that it provides only a "modicum" of protection greater than that of the insured.

## II.

The issue, therefore, is whether the separate contract between the insurer and the loss payee allows the insurer to retroactively cancel it. In interpreting an insurance contract, standard principles of contract law apply. *See Hurley v. Tennessee Farmers Mut. Ins. Co.*, 922 S.W.2d 887, 892 (Tenn. App. 1995); *Union Planters*, 865 S.W.2d at 912. In construing contracts, the words expressing the parties' intentions should be given their usual, natural, and ordinary meaning. *See Taylor v. White Stores, Inc.*, 707 S.W.2d 514 (Tenn. App. 1985). All provisions of a contract should be construed as in harmony with each other, if such construction can be reasonably made, so as to avoid repugnancy between the several provisions of a single contract. *See Bank of Commerce & Trust Co. v. Northwestern Nat'l Life Ins. Co.*, 160 Tenn. 551, 26 S.W.2d 135 (1930).

Additionally, where by reason of ambiguity in the language employed in a contract of insurance, if there is doubt or uncertainty as to its meaning, and it is fairly susceptible of two interpretations, one favorable to the insured and the other favorable to the company, the former will be adopted. *See*

---

Loss or damage under this policy shall be paid, as interest may appear, to you and the loss payee shown in the Declarations. This insurance covering the interest of the loss payee shall not become invalid because of your fraudulent acts or omissions unless the loss results from your conversion, secretion, or embezzlement of your covered auto ...

8

*Elsner v. Walker*, 879 S.W.2d 852, 855 (Tenn. App. 1994)*; See also Palmer v. State Farm Mut. Auto Ins. Co.* , 614 S.W.2d 788, 789 (Tenn. 1981); *Travelers Ins. Co. v. Aetna Cas. and Sur. Co.*, 491 S.W.2d 363, 365 (Tenn. 1973) (exclusions will be strongly construed against the insurer).

While a standard mortgage clause creates a separate contract of insurance for the mortgagee's separate benefit, that separate contract is engrafted upon the main policy and can be understood by reference to the policy. *See Union Planters*, 865 S.W.2d at 912. However, the standard mortgage clause will prevail, as to the loss payee's interest, over contrary provisions in the policy. *See Third Nat'l Co.*, 191 S.W.2d at 193. As stated in *Laurenzi*, the insurance policy is to be referred to and will be used to supplement or complete the terms of the mortgagee's contract only "in so far as the policy with the mortgagor is in harmony therewith." *Laurenzi,* 176 S.W. at 1024.

The provisions of the separate contract between the loss payee and the insurer, created by the standard mortgage clause, determine the loss payee's rights. "Obviously, any claim ... must arise from a contract and the contract between the parties in this instance is the breach of warranty endorsement [standard mortgage clause], which provisions must control." *Union Planters*, 865 S.W.2d at 912. Thus, the language of the standard mortgage clause, or loss payable clause, is the primary source of the loss payee's rights. *See Phoenix v. Greene County Farmers' Mut.*, 54 S.W.2d at 972; *Phoenix v. Aetna Ins. Co.,* 59 S.W.2d at 518. The independent or separate contract "is measured by the terms of the mortgage clause itself." *Noles*, 813 S.W.2d at 439.

Both parties rely on the same paragraph in the insurance contract (the loss payable clause), but differ in their interpretation of that paragraph by stressing different provisions within it. The insurer relies on the language of the loss payable provision which states: "We reserve the right to **cancel** the policy as permitted by policy terms[3] and **cancellation** shall terminate this agreement as to the loss payee's interest." (emphasis added). The insurer argues that it retroactively canceled the policy as to the insured, and that such cancellation also terminated the loss payee's interest.

On the other hand, the loss payee relies upon the provision which states, "This insurance with respect to the interest of the loss payee, shall not become **invalid** because of your fraudulent acts or omissions unless the loss results from your conversion, secretion or embezzlement of your covered auto." (emphasis added).

---

[3] The terms of the policy governing cancellation provide:

**TERMINATION**

A. **Cancellation**. This policy may be canceled during the policy period as follows:
   ***

 2. We may cancel by mailing to the named insured shown in the Declarations at the address shown in this policy:

  a. at least 10 days notice:
   (1) if cancellation is for nonpayment of premium; or

   (2) if notice is mailed during the first 60 days this policy is in effect and this policy is not a renewal or continuation policy; or

  b. at least 20 days notice in all other cases
   ***

 3. After this policy is in effect for 60 days, or if this is a renewal or continuation policy, we will cancel only:
   ***
  c. If the policy was obtained through material misrepresentation.
   ***

D. **Other Termination Provisions.**
   ***
 3. The effective date of cancellation stated in the notice shall become the end of the policy period.

10

The loss payable paragraph can be read to give effect to all of its component provisions, and can be read in harmony with the policy as a whole, if the words "invalid" and "cancel" are given their plain and distinct meanings.  By the language it used, Granite State has promised the loss payee that the insurance will not become invalid as to the loss payee's interest due to fraudulent acts or omissions of the insured except those specific acts named in the loss payable clause. A cancellation which is retroactive to the date of issuance of the policy is, in effect, an attempt to render the policy invalid from its inception. The insurer cannot avoid its commitment not to invalidate the loss payee's interest by calling its action a cancellation which became effective on the date of policy issuance. In view of the insurer's commitment to the loss payee, the terms "cancel" and "cancellation",  must be interpreted as providing a prospective remedy only, unavailable to invalidate the loss payee's interest after a loss,[4] absent one of the circumstances enumerated by the insurer in its contract with the loss payee.[5]

The insurer would have us interpret its commitment to the loss payee to be limited to the situation where the insured's misrepresentation relates to the loss, asserting:  "Where the insurer would seek to avoid payment of a loss after its occurrence because of some fraudulent conduct of the insured in reference to the loss, the loss payee would be protected by the provision of the loss payable clause in regard to fraud of the insured. Where, however, the insured lawfully cancels the policy pursuant to its cancellation provision, and

---

[4] Generally, the rights of a loss payable mortgagee are determined at the time of the loss. *See Benton Banking Co. v. Tennessee Farmers Mut. Ins. Co.*, 906 S.W.2d 436, 438 (Tenn. 1995).

[5] It is undisputed that the insured did not commit any of the acts so enumerated, and the insurer itself characterizes the insured's misrepresentations as fraudulent.

11

the reasons have nothing to do with fraud of the insured in connection with the loss, instead having to do with fraud in the inception by the insured wrongfully procuring the policy, the cancellation is as effective against the loss payee as against the insured."

We disagree with the insurer's interpretation of the loss payee's separate contract. The loss payable provision simply does not contain the words the insurer would have us insert. We interpret the provision as prohibiting invalidation by the insurer of the loss payee's interest due to any fraudulent acts or omissions of the insured except those enumerated in the provision itself.[6]

### III.

The insurer also argues that the insured's misrepresentation in the application renders the policy voidable from its inception, at the option of the insurer, on the basis of provisions of the policy and on the basis of Tenn. Code Ann. § 56-7-103.

The insurer relies upon the policy's termination provisions and the following two provisions, the first of which is part of the loss payable clause, and the second of which is referred to as the fraud provision:

> However, we reserve the right to cancel the policy as permitted by policy terms and cancellation shall terminate this agreement as to the loss payee's interest. We will give the same advance notice of cancellation to the loss payee as we give to the named insured shown in the Declarations.
>
> . . .

---

[6] In *Noles*, 813 S.W.2d at 439, this Court held that the loss payee was protected even though the insured had let the policy lapse by failing to pay premiums. The loss payable clause in that contract required the insurer to give ten days notice prior to cancellation of the lienholder's protection and also stated that the loss payee's interest would "not be invalidated by any act or neglect of the . . . mortgagor." *Id.*

12

> We do not provide coverage for any 'insured' who has made fraudulent statements or engaged in fraudulent conduct in connection with any accident or loss for which coverage is sought under this policy.

It is the insurer's position that the fraud provision allows it to cancel the policy due to the insured's misrepresentation, that the termination provision allows the cancellation to become effective on the date the insurer chooses to state in the notice of cancellation, that the cancellation notice herein dated November 25, 1996, stated that the cancellation was to take effect at 12:01a.m. on February 28,1996, that the loss payee was only entitled to the same notice as the insured, and that the retroactive cancellation was valid as to both the insured and the loss payee under the language of the loss payable clause.

We respectfully do not agree with the insurer's interpretation of the policy provisions as they apply to the separate contract with the loss payee. First, although the loss payee's interest can be terminated by cancellation, that cancellation must comply with the policy terms, under the language the insurer relies on and under well-settled law. When an insurance company seeks to cancel a policy, strict compliance with policy cancellation provisions is required in order to effectuate cancellation. *See Jefferson Ins. Co. v. Curle*, 771 S.W.2d 424 (Tenn. App. 1989); *State Automobile Mut. Ins. Co. v. Lloyd*, 54 Tenn. App. 587, 393 S.W.2d 17 (1965).

The termination provisions of the policy contain no language authorizing retroactive cancellation and, in fact, require advance notice of cancellation. The insurer has promised to give the loss payee the same **advance** notice as is given to the insured. Second, even if the fraud clause

13

provides a basis for the insurer to deny coverage *ab initio*[7] to the insured,

there is a distinction between canceling a policy and denying coverage after a

loss or attempting to avoid the policy. While we agree that such a distinction

may not have practical meaning with regard to the insured in this situation, it

has significance to the interest of the loss payee by virtue of the language used

by the insurer in its policy. Lastly, the fraud clause, by its terms, applies only

to coverage of the insured. It does not affect the loss payee's separate

contract.

We find that the policy provisions do not authorize the insurer to

retroactively cancel the policy so as to invalidate the loss payee's interest on

the basis of the insured's misrepresentation in his application.

IV.

The insurer also relies on Tenn. Code Ann. § 56-7-103 as authorizing it

to void the policy, thereby invalidating the loss payee's interest. That statute

provides:

> No written or oral misrepresentation or
> warranty therein made in the negotiations of a
> contract or policy of insurance, or in the application
> therefor, by the insured or in the insured's behalf,
> shall be deemed material or defeat or void the policy
> or prevent its attaching, unless such
> misrepresentation or warranty is made with actual
> intent to deceive, or unless the matter represented
> increases the risk of loss.

As stated by the insurer, Tenn. Code Ann. § 56-7-103 provides an

insurer with a defense which may render a contract voidable.[8] *See National*

---

[7] The validity of the cancellation *ab initio* as to the insured is not at issue in this appeal.

[8] A voidable contract is one where one or more parties have the power to avoid the legal relations created by the contract, or by ratification of the contract to extinguish the power of avoidance. Accordingly, a voidable contract is valid and binding until it is avoided by the party entitled to avoid it. *See Newton v. Cox*, 878 S.W.2d 105, 108 (Tenn 1994).

14

*Union Fire Ins. Co. v. F.D.I.C.,* 837 S.W.2d 373, 381 (Tenn. 1992). The statute prohibits an insurer from invalidating an insurance contract except in the specified circumstances. Where those circumstances are present, an insurer is allowed, but not required, to avoid a contract. An insurer retains the option to waive invalidation and continue a contract of insurance after discovery of misrepresentation. An insurer also retains the right to limit its ability to void a policy by an express agreement to do so. Similarly, we see no reason why an insurer cannot, by contract, agree to waive its right to invalidate a policy as to the loss payee to whatever extent it wants.

With regard to the effect of Tenn. Code Ann. § 56-7-103 on the separate and independent contract between Granite State and Ed's Imports, even if Granite State can avoid its contract with the insured in reliance on the statute and its policy provisions, the voiding of that contract does not automatically render the separate contract with the loss payee void.[9]

In *Jackson v. American Eagle Fire Insurance Co.*, 92 S.W.2d 874 (Tenn. 1936), our Supreme Court held that both the insured and the loss payee were cut off from their right to recover where, at the time of the purchase of the policy, the loss payee was aware that the insured did not have unconditional ownership of the covered property, as was required by the policy. The court relied in part upon the statute and upon the standard mortgage clause in that policy which required the mortgagee to give notice of

_____

[9] Oklahoma courts have held that a standard or union clause is effective to protect the interest of the mortgagee even though the policy itself was void *ab initio* as to the mortgagor. *Great American Ins. Co. v. Southwestern Finance Co.*, 297 P.2d 403 (Okla. 1956); *Oklahoma State Union of Farmers' Educational & Cooperative Union v. Folsom*, 325 P.2d 1053 (Okla. 1958). Similarly, in *Pittsburgh National Bank v. Motorists Mutual Ins. Co.*, 87 Ohio App.3d 82, 621 N.E.2d 875 (1993), the court held that where the actions of the insured would render the loss beyond the scope of the policy coverage, the mortgagee is not precluded from coverage, absent such a limitation in the loss payable clause.

15

any increase in hazard, finding that ownership as tenant by the entirety while insuring the property as sole owner was an increased hazard. *Id.* at 875.

However, in *Third National Co.*, this Court found that a misrepresentation as to the nature of the use of the insured premises and a breach of a stipulation against an increase in hazard did not render the policies void, where the policy included the statement that the entire policy, unless otherwise agreed, would be void if the hazard was increased by any means within the control or knowledge of the insured. *Id.*, 191 S.W.2d at 192. Holding that the policies were "merely voidable if the insurers chose to avoid them," the Court further stated:

> The policies, however, were voidable only as to the insured, not as to the mortgagee. Such is the effect of the mortgage clause. This misrepresentation, or increase of the hazard, was an act of the insured, not participated in or known by the mortgagee. That clause stipulates, among other things, that the insurance as to the interest of the mortgagee 'shall not be invalidated by any act or neglect' of the mortgagor or owner of the property insured, nor by the 'occupation of the premises for purposes more hazardous than are permitted' by the policy.

*Id.*, 191 S.W.2d at 193.

In *General Electric Credit Corporation v. Kelly & Dearing Aviation*, 765 S.W.2d 750 (Tenn. App. 1988) this court denied recovery to the lienholder/loss payee because it found that the loss was due to conversion, a situation expressly excluded from the protection afforded the loss payee in the policy. The relevant provision of the policy stated, "should you do anything which makes your coverage invalid, we will still make a payment to that lienholder or lessor . . . . We won't cover your conversion, embezzlement or secretion of the aircraft." The insurer also had argued that the insured had

16

made material misrepresentations on its application, thereby rendering the policy void *ab initio*, and that the policy should be considered as if it never existed. Id. at 753. This court found no evidence of misrepresentation in the application, but stated:

> Furthermore, in Tennessee clauses such as this, lienholder's endorsement have long been held to create "a separate and independent contract between the insurer and the mortgagee that the latter's rights cannot be invalidated by any act or neglect of the mortgagor or insured . . ." *Third National Company v. Thompson*, 191 S.W.2d 190, 193 (Tenn. App. 1945). *See also*, *Couch on Insurance* 2d, § 74: 347.

*Id*.

> The court further held:
>
> The language used in the lienholder's endorsement provides that, regardless of whether the insured does anything which would cause his coverage to be invalidated, the insurer will pay the lienholder.
>
> . . .
>
> [U]nless conversion, embezzlement or secretion by [insured] can be shown, [lienholder] is entitled to payment under the lienholder's endorsement.

*Id.*

Similarly, in *First Tennessee Bank National Ass'n v. U.S. Fidelity and Guaranty Co.,* 829 S.W.2d 144, (Tenn. App. 1991), this court found, partially on the basis of Tenn. Code Ann. § 57-6-103, that a mortgagee bank's failure to disclose material information (the co-insured former spouse had threatened to burn his dwelling to the insurer made the separate contract between the mortgagee and the insurer voidable. The court based its reasoning on the fact that the mortgagee, as a party to the independent contract created by the mortgage clause, was under the duty to disclose conditions affecting the risk.

17

*Id.*

In the case now before us, there is neither proof nor allegation that Ed's Imports, the loss payee, had any knowledge of the insured's misrepresentation on his application. Such knowledge and failure to disclose, if under a duty to do so, appear to be the determining factors in denying recovery to a loss payee due to an insured's misrepresentation. This interpretation is consistent with the premise that the loss payee has a separate contract and with the law regarding the ability of an insurer to avoid liability under its contract with the insured on the basis of misrepresentation by the insured. To avoid coverage on the basis of the statute, the insurer must first prove a misrepresentation. *See Gatlin v. World Serv. Life Ins. Co.*, 616 S.W.2d 606, 608 (Tenn. 1981); *Womack v. Blue Cross & Blue Shield*, 593 S.W.2d 294, 295 (Tenn. 1980). Since Ed's Imports committed no misrepresentation, the statute cannot be used by the insurer to void its separate contract with the loss payee.

In essence, the statute provides to an insurer a defense of misrepresentation to a claim by the insured under an insurance contract, when properly pled and under the appropriate circumstances. *See, e.g., National Union Fire Ins. v. F.D.I.C.*, 837 S.W.2d 373 (Tenn. 1992); *Bland v. Allstate Ins. Co.*, 944 S.W.2d 372 (Tenn. App. 1996). We interpret the loss payable clause at issue as an assurance that the insurer will not assert the defense of the insured's misrepresentation provided by Tenn. Code Ann. § 56-7-103 against the loss payee, unless the loss resulted from the insured's conversion, secretion or embezzlement of the covered auto. It is undisputed that Mr. Nance did not convert, secrete or embezzle the insured automobile, therefore, under the terms of the loss payable clause, his conduct does not give the

18

insurance company the right to assert the defense of misrepresentation against the loss payee.

IV.

Granite State, through the language of its policy provisions, provided greater protections to the loss payee than it provided to the insured, and in so doing created a separate and independent contract between itself and Ed's Imports. Based on the foregoing we interpret the language of the loss payable clause in the instant case to prohibit the insurance company from retroactively canceling the contract or rendering it invalid or void *ab initio* with respect to the loss payee.

The case is remanded to the trial court for whatever further proceedings may be necessary. The costs of this appeal are hereby taxed to the appellant.

_____<br>PATRICIA J. COTTRELL, JUDGE

CONCURS:

_____
BEN H. CANTRELL, P. J., M.S.

DISSENTS IN SEPARATE OPINION:

WILLIAM C. KOCH, JR., J.